EXHIBIT A

EXHIBIT A 



# CYBER INSURANCE POLICY

## Connelly Law Offices, PLLC





**POLICY EFFECTIVE DATE**
05/06/2024

*All information in this document was created by the insurer.*

# DECLARATIONS
# COMMERCIAL CYBER INSURANCE POLICY

**THIS INSURANCE POLICY PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED PERIOD.**

**DEFENSE EXPENSES, WHERE APPLICABLE, ARE INCLUDED IN THE LIMITS OF INSURANCE, AND PAYMENT THEREOF WILL ERODE, AND MAY EXHAUST THE LIMITS OF INSURANCE.**

**PLEASE READ YOUR POLICY CAREFULLY.**

The words "You" and "Your" refer to the Named Insured shown in the Declarations. The words "We", "Us" and "Our" refer to the Company providing this insurance.

In return for the payment of premium, and subject to all the terms and conditions of this Policy, We agree with You to provide the insurance as stated in this Policy.

| | |
|---|---|
| Company Name: | Spinnaker Insurance Company |
| Producer Name: | Cowbell Insurance Agency LLC<br>6800 Koll Center Pkwy, Suite 250<br>Pleasanton, CA 94566 |

| |
|---|
| Named Insured:<br>*Connelly Law Offices, PLLC* |
| Policy Number:<br>*FLY-CB-DU1RCVKXK-003* |
| Mailing Address:<br>*2301 North 30th Street*<br>*Tacoma, WA 98403* |

| Policy Period: | | |
|---|---|---|
| | From: | *May 06, 2024* |
| | To: | *May 06, 2025* |
| | 12:01 AM standard time at the Insured's mailing address shown above | |

| |
|---|
| Website Address(es):<br>*www.connelly-law.com* |

Type Of Business Organization (Check appropriate box):

| ☑ Private | ☐ Publicly Traded |
|---|---|
| ☐ Investment Fund | ☐ Not for Profit |
| ☐ Government | |

| | |
|---|---|
| Annual Premium: | *$6,603* |
| Fees/Assessments:<br>(included in total Annual Premium, unless otherwise noted) | *$100* |
| Policy Aggregate Limit of Insurance: | *$1,000,000* |
| Policy Deductible Amount: | *$5,000*<br>*Per Cyber Incident, Extortion Threat,*<br>*Security Breach, Wrongful Act,*<br>*Interrelated Wrongful Acts, or Claim* |
| Business Income and Contingent Business and Extra Expense Time Deductible: | *6 Hours* |
| Social Engineering Coverage Limit (if applicable): | *$100,000* |
| Social Engineering Deductible (if applicable): | *$10,000* |
| Reverse Social Engineering Coverage Limit (if applicable): | *N/A* |
| Reverse Social Engineering Deductible (if applicable): | *N/A* |
| Breach Costs Outside of Limits Coverage Limit (if applicable): | *N/A* |
| Service Fraud and Crypto jacking Coverage Limit (if applicable): | *N/A* |
| Retroactive Date: | *Full Prior Acts* |

| Aggregate Sublimit(s) of Insurance: | Percentage | Coverage Limit |
|---|---|---|
| Insuring Agreement 1. Public Relations Expense | *5%* | *$50,000* |
| Insuring Agreement 2. Extortion Threat and Ransom Payments | *50%* | *$500,000* |
| Insuring Agreement 4. Business and Contingent Business Income and Extra Expense | *100%* | *$1,000,000* |

| Endorsements: | Effective Date | Coverage Limit |
|---|---|---|
| *OFAC*<br>*SP WA 96 05 22* | *May 06, 2024* | |
| *Terrorism Disclosure Policy*<br>*SP CW 67 02 23* | | |
| *Electronic Delivery Policy*<br>*SP WA 94 08 22* | | |
| *Privacy Disclosure*<br>*SP CW Privacy Disclosure* | | |
| *Signature Page*<br>*SP CW 93 05 22* | | |
| *Computer and Funds Transfer Fraud*<br>*SP WA 80 02 23* | *May 06, 2024* | |
| *Increase of or Elimination of Business Income and Extra Expense Sublimit Endorsement*<br>*SP WA 72 02 23* | *May 06, 2024* | *$1,000,000* |
| *Social Engineering Endorsement*<br>*SP WA 91 02 23* | *May 06, 2024* | *$100,000* |

| | | |
|---|---|---|
| *Telecommunications Fraud Endorsement*<br>*SP WA 85 05 22* | *May 06, 2024* | *$50,000* |
| *Hardware Replacement Costs Endorsement*<br>*SP WA 86 05 22* | *May 06, 2024* | *$50,000* |
| *Website Media Content Liability*<br>*SP WA 83 05 22* | *May 06, 2024* | *$1,000,000* |

Claims Information:

To report Claims, please use the contact information below:

| | |
|---|---|
| Phone Number: | 833-633-8666 |
| Email: | claims@cowbellcyber.ai |

# COMMERCIAL CYBER INSURANCE POLICY

**THIS POLICY IS A CONTRACT OF INSURANCE BETWEEN YOU AND US. YOUR POLICY CONTAINS ALL THE DETAILS OF THE COVER THAT WE PROVIDE. THIS POLICY CONSISTS OF AND MUST BE READ TOGETHER WITH THE DECLARATIONS PAGE AND ANY ENDORSEMENTS.**

**THE INSURANCE PROVIDED UNDER THIS POLICY FOR CLAIMS MADE AGAINST YOU IS ON A CLAIMS MADE BASIS, AND APPLIES TO CLAIMS ONLY IF THEY ARE FIRST DISCOVERED BY YOU AND DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN WRITING TO US AS SOON AS REASONABLY PRACTICABLE OR AS OTHERWISE PROVIDED IN SECTION VI. CONDITIONS, PARAGRAPH 14 DUTIES IN THE EVENT OF CLAIM OR LOSS.**

**THE SECURITY BREACH LIABILITY INSURING AGREEMENT CONTAINED IN THIS POLICY PROVIDES COVERAGE FOR DEFENSE EXPENSES WHICH ARE PAYABLE WITHIN, AND NOT IN ADDITION TO, THE LIMIT OF INSURANCE.  PAYMENT OF DEFENSE EXPENSES UNDER THIS POLICY WILL REDUCE THE LIMIT OF INSURANCE.**

### PLEASE READ THE ENTIRE POLICY CAREFULLY.

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the words "You" and "Your" refer to the **Named Insured** shown in the Declarations. The words "We," "Us," and "Our" refer to the company providing this insurance.

All terms that appear in bold print are defined terms and have special meaning as set forth in Section I – Insuring Agreements and Section II – Definitions.

## SECTION I – INSURING AGREEMENTS

Coverage is provided under the following Insuring Agreements up to the Limits of Insurance shown in the Declarations.

Any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** that arises out of the same facts or circumstances and results in **Loss** under one or more of the following Insuring Agreements will be deemed to be related and, as such, will be deemed to have been Discovered during the earliest policy period that any such related **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** was **Discovered**.

1.      **Security Breach Expense**

   We will pay for **Loss** resulting directly from a **Security Breach**, or **Cyber Incident Discovered** during the **Extended Reporting Period**.

   With respect to this Insuring Agreement 1, **Loss** means:

   a.      **Forensics Expenses – Including Breach Counsel Expenses**

      The costs incurred with Our approval to establish whether a **Security Breach** or **Cyber Incident** has occurred or is occurring.

      If a **Security Breach** has occurred, the following costs are also included:

      i.      costs to investigate the cause, scope and extent of a **Security Breach** and to identify any affected parties; and

      **ii.**     costs to determine any action necessary to remediate the conditions that led to or resulted from a **Security Breach** including, but not limited to, fees paid for legal and other professional advice on how to respond to the **Security Breach**.

**b.**      **Notification Expenses – Including Breach Counsel Expenses**

Costs to notify all parties affected by a **Security Breach** including, but not limited to, notice to be transmitted through media:

      **i.**     as required by Privacy Regulations; or
      **ii.**    subject to Our prior approval, as appropriate on a voluntary basis.

**c.**      **Overtime Salaries**

Reasonable overtime salaries paid to **Employees** assigned to handle inquiries from the parties affected by a **Security Breach**.

**d.**      **Call Center Expenses**

Fees and costs of a company hired by You with Our approval for the purpose of operating a call center to handle inquiries from the parties affected by a **Security Breach**.

**e.**      **Post-event Monitoring Expenses**

Costs to provide credit and identity monitoring services to the affected parties of a **Security Breach** for up to one (1) year, or longer if required by applicable law, from the date of notification to those affected parties of such **Security Breach**.

**f.**      **Public Relations Expense**

Fees and costs of a public relations firm and any other reasonable expenses incurred by You with Our prior written consent to protect or restore Your reputation solely in response to "negative publicity" resulting directly from a **Cyber Incident** or a **Cyber Security Breach** that is **Discovered** during the Policy Period.

As used in this provision, "negative publicity" means information which has been made public that has caused, or is reasonably likely to cause, a decline or deterioration in the reputation of the **Named Insured** or of one or more of its products or services.

**g.**      **Other Expenses**

Any other reasonable expenses incurred by You in connection with a **Security Breach** or **Cyber Incident** with Our prior written consent.

With respect to this Insuring Agreement 1, **Loss** does not include any costs or expenses associated with upgrading or improving a **Computer System** as a result of a **Security Breach**.

**2.**      **Extortion Threats**

We will pay for **Loss** resulting directly from an **Extortion Threat** that is **Discovered** during the Policy Period or **Extended Reporting Period**.

With respect to this Insuring Agreement 2, **Loss** means:

**a.**      Fees and costs of:

i) a security firm; or
ii) a person or organization

hired with Our consent to determine the validity and severity of an **Extortion Threat** made against You.

**b.** Interest costs paid by You for any loan from a financial institution taken by You to pay a ransom demand.

**c.** Reward payments paid by You to an "informant" which lead to the arrest and conviction of parties responsible for **Loss**;

As used in this provision, "informant" means a person, other than an **Employee**, providing information not otherwise obtainable, solely in return for a reward offered by You.

**d.** Any other reasonable expenses incurred by You with Our written consent, including, but not limited to:

**i.** fees and costs of independent negotiators; and
**ii.** fees and costs of a company hired by You, upon the recommendation of the security firm, to determine how to protect Your **Electronic Data** from further threats.

**e.** Monetary value of any **Ransom Payment** made by You to a third party for **Random Demands.**

**3.  Replacement or Restoration of Electronic Data**

We will pay for **Loss** of Your **Electronic Data** or "computer programs" stored within a **Computer System** resulting directly from a **Cyber Incident** that is **Discovered** during the **Extended Reporting Period**.

With respect to this Insuring Agreement 3, **Loss** means the costs to replace or restore Your **Electronic Data** or "computer programs" as well as the cost of data entry, reprogramming and computer consultation services**.**

With respect to this Insuring Agreement 3, **Loss** does not include the cost to duplicate research that led to the development of Your **Electronic Data** or "computer programs." To the extent that any of Your **Electronic Data** cannot be replaced or restored, We will pay the cost to replace the media on which such **Electronic Data** was stored with blank media of substantially identical type.

As used in this Insuring Agreement 3, **"**computer program" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enables the computer or devices to receive, process, store or send Your **Electronic Data**.

**4.  Business Income, Contingent Business Income and Extra Expense**

We will pay for **Loss** due to an **Interruption** resulting directly from a **Cyber Incident** or an **Extortion Threat** that is **Discovered** during the Policy Period or **Extended Reporting Period**.

With respect to this Insuring Agreement 4, **Loss** means the actual **Loss** of: (1) "business and contingent business income" You sustain; and/or (2) "extra expense" You incur.

As used in this Insuring Agreement 4:

**a.** "Business and contingent business income" means the:

**i.** net income (net profit or loss before income taxes) that would have been earned or incurred; and

      **ii.**      continuing normal operating expenses incurred, including payroll.

      "Business and contingent business" income does not include:

      (1) Net Profit that may or would likely have been earned as a result of an increase in volume due to favorable business conditions caused by the impact of network security failures impacting other businesses, loss of market, or any other consequential loss

**b.**      **"Extra expense"** means necessary and reasonable expenses You incur:

      **i.**      during an **Interruption** that You would not have incurred if there had been no interruption; or

      **ii.**      to avoid or minimize the suspension of Your **E-Commerce Activities.**

      "Extra expense" does not include:

      **(1)**      any costs or expenses associated with upgrading, maintaining, repairing, remediating or improving a **Computer System** as a result of a **Cyber Incident** or **Extortion Threat**; or

      **(2)**      **Extortion Expenses** covered under Insuring Agreement 2 – Extortion Threats.

**5.**      **Security Breach Liability** Including Payment Card Industry (PCI) Fines and Penalties.

      We will pay for:

**a.**      **Loss** that the **Insured** becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim** that is **Discovered** during the Policy Period or any **Extended Reporting Period**, for a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

**b.**      **Loss** and **Defense Expenses** as a result of a **Claim** in the form of a **Regulatory Proceeding** that is **Discovered** during the Policy Period or any **Extended Reporting Period**, in response to a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

**c.**      **Loss** and **Defense Expenses** as a result of a **Claim** in the form of an action by a **Card Company** for non-compliance with the Payment Card Industry (PCI) Data Security Standards that is **Discovered** during the Policy Period or any **Extended Reporting Period**, in response to a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

      With respect to this Insuring Agreement 5:

      **i.**      **Loss** means:
            **(a)**  Compensatory damages, settlement amounts and costs awarded    pursuant    to judgments or settlements; or
            **(b)**  The monetary amount owed by You under the terms of a PCI merchant services agreement with a **Card Company** as a direct result of a **Security Breach**.

            **Loss** does not include:

            **(a)**      civil or criminal fines or penalties imposed by law;
            **(b)**      the multiplied portion of multiplied damages;
            **(c)**      punitive or exemplary damages;
            **(d)**      taxes;

| | |
|---|---|
| **(e)** | royalties; |
| **(f)** | the amount of any disgorged profits; |
| **(g)** | matters that are uninsurable pursuant to law; |
| **(h)** | any fees resulting from the recall, re-performance or correction of services, content, goods or activities; |
| **(i)** | the costs to comply with injunctive or other non-monetary relief; or |
| **(j)** | liquidated damages pursuant to a contract, to the extent such amount exceeds the amount for which You would have been liable in the absence of such contract, except for amounts under Paragraph i.(b) above. |

**ii.** **Defense Expenses** means the reasonable and necessary fees (attorneys' and experts' fees) and expenses incurred in the defense or appeal of a **Claim**, including the cost of appeal, attachment or similar bonds (without any obligation on Our part to obtain such bonds) but excluding wages, salaries, benefits or expenses of Your **Employees**.

**iii.** **Regulatory Proceeding** means an investigation, demand or proceeding brought by, or on behalf of, the Federal Trade Commission, Federal Communications Commission, the Department of Health and Human Services or other administrative or regulatory agency, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity, including, but not limited to any investigation, demand, or proceeding, brought by an administrative or regulatory agency whether involving the California Consumer Privacy Act (CCPA), the General Data Protection Regulation (GDPR), or similar privacy regulations. .

## SECTION II – DEFINITIONS

**1.** **Application** means the signed application for this Policy, including any attachments, attestations, and other materials submitted in conjunction with the signed application, digital or otherwise.

**2.** **Card Company** means American Express, Discover Financial Services, JCB International, MasterCard Worldwide, Visa Inc. or any other credit card company that requires its merchants to adhere to the Payment Card Industry (PCI) Data Security Standards.

**3.** **Claim** means:

**a.** A written demand for monetary or nonmonetary damages, including but not limited to injunctive relief;

**b.** A civil proceeding commenced by the service of a complaint or similar proceeding;

**c.** Under Paragraph b. of Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, a **Regulatory Proceeding** commenced by the filing of a notice of charges, formal investigative order, service of summons or similar document; or

**d.** Under Paragraph c. of Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties an action brought by a **Card Company** of the Payment Card Industry (PCI);

against any **Insured** for a **Wrongful Act**, including any appeal therefrom.

**4.** **Computer System** means any computer, including transportable or handheld devices, electronic storage devices and related peripheral components; any systems and applications software, or any related telecommunications networks connected to or used in connection with such computer or devices: i) which collects, transmits, processes, stores or retrieves Your **Electronic Data**; and ii) which is:

**a.** Owned by You;

**b.** Leased by You and operated by any **Insured**;

    **c.**     Owned and operated by an **Employee** who has agreed in writing to Your personal devise use policy; or

    **d.**     Operated by an authorized **Third Party**, but only with respect to Your **Electronic Data**.

**5.**    **Cyber Incident** means:

    **a.**     Any i) **Hacker** attack; ii) malicious code; or iii) **Virus** that is directed at, enacted upon or introduced into a **Computer System** (including Your **Electronic Data**) and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, use or prevent or restrict access to or the use of any part of a **Computer System** (including Your **Electronic Data**) or otherwise disrupt its normal functioning or operation.

          Recurrence of the same **Virus** after a **Computer System** has been restored shall constitute a separate **Cyber Incident**.

    **b.**     Any denial of service attack specifically directed at You which disrupts, prevents or restricts access to or use of a **Computer System**, as defined in Paragraph 4 of this Section II. Definitions, or otherwise disrupts the normal functioning or operation of a **Computer System**.

**6.**    **Discovery** or **Discovered** means the time when any **Employee** who is a Chief Executive Officer, Chief Financial Officer, Chief Security Officer, Chief Technology Officer, Chief Information Officer, Risk Manager, General Counsel, owner, general manager, or any functionally equivalent positions of the **Insured** or any **Subsidiary**, regardless of title first becomes aware of facts which would cause a reasonable person to believe that a **Loss** covered by this Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such **Loss** occurred, even though the exact amount or details of **Loss** may not then be known.

    **Discovery** or **Discovered** also means the time when any **Insured** first receives notice of an actual or potential **Claim** in which it is alleged that You are liable to a third party under circumstances which, if true, would constitute a **Loss** under this Policy.

**7.**    **E-commerce Activities** means those activities conducted by You in the normal conduct of Your business via Your web site or Your e-mail system.

**8.**    **Electronic Data** means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on electronic storage devices including, but not limited to, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment. **Electronic Data** is not tangible property.

    **Electronic Data** does not include Your **Electronic Data** that is licensed, leased, rented or loaned to others.

**9.**    **Employee** means any natural person who was, now is, or will be:

    **a.**     Employed on a full- or part-time basis;

    **b.**     Furnished temporarily to You to substitute for a permanent employee on leave or to meet seasonal or short-term workload conditions;

    **c.**     Leased to You by a labor leasing firm under an agreement between You and the labor leasing firm to perform duties related to the conduct of Your business but does not mean a temporary employee as defined in this Paragraph 9.b.;

    **d.**     An officer;

    **e.**     A director, trustee or manager (if a limited liability company);

    **f.**     A volunteer worker;

    **g.**     A partner or member (if a limited liability company); or

    **h.**     An **Independent Contractor**;

of the **Named Insured** and those of any organization qualifying as a **Subsidiary** under the terms of this Policy, but only while acting within the scope of their duties as determined by the **Named Insured** or such **Subsidiary**.

10.    **Extended Reporting Period** means a designated period immediately following cancellation, nonrenewal, decrease in limits, reduced coverage, increased deductible or self-insured retention, newly added exclusions, or any other changes which are less favorable to the **Insured** of the Policy, during which **Claims** first made against the **Insured** will be deemed made during the Policy Period and prior to the effective date of cancellation, nonrenewal, decrease in limits, reduced coverage, increased deductible or self-insured retention, newly added exclusions, or any other changes which are less favorable to the **Insured,** of the Policy.

11.    **Extortion Threat** means a threat or series of related threats:

    **a.**    to perpetrate a **Cyber Incident**;

    **b.**    to disseminate, divulge or utilize: i) Your proprietary information; or ii) weakness in the source code within a **Computer System** by gaining unauthorized access to a **Computer System**;

    **c.**    to destroy, corrupt or prevent normal access to a **Computer System** (including **Your Electronic Data**) by gaining or having gained unauthorized access to a **Computer System**;

    **d.**    to inflict **Ransomware** on a **Computer System**; or

    **e.**    to publish Your client's or **Employee's Personal Information**.

    **Extortion Threat** does not include a threat or series of threats to any **Third Party**.

12.    **Hacker** means a person who accesses a **Computer System** (including Your **Electronic Data**) who is: i) not authorized to have such access; or ii) authorized to have such access but who uses such access in an unauthorized manner.

13.    **Independent Contractor** means any person or entity contracted by the **Named Insured** to perform the same business operations as the **Named Insured**, but only while in the course of their performance of such business operations on behalf of, or at the direction of, the **Named Insured.**

14.    **Insured** means any **Named Insured** and its **Employees**.

15.    **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any: i) fact, circumstance, situation, event, transaction or cause; or ii) a series of casually connected facts, circumstances, situations, events, transactions or causes.

16.    **Interruption** means:

    **a.**    With respect to a **Cyber Incident**:

        **i.**    an unanticipated cessation or slowdown for Your **E-Commerce Activities**; or

        **ii.**    Your suspension of Your **E-Commerce Activities** for the purpose of avoiding or mitigating the possibility of transmitting a **Virus** or malicious code to another person or organization;

        and, with regard to Paragraphs a.(i) and a.(ii) above, shall be deemed to begin when Your **E-Commerce Activities** are interrupted and ends at the earliest of:

        **(1)**    one hundred-eighty (180) days after the **Interruption** begins;

        **(2)**    the time when Your **E-Commerce Activities** are resumed; or

        **(3)**    the time when service is restored to You.

    **b.**    With respect to an **Extortion Threat**, Your voluntary suspension of Your **E-Commerce Activities**:

      **i.**      based upon clear evidence of a credible threat; or
      **ii.**     based upon the recommendation of a security firm, if any;

      and, with regard to Paragraphs b.(i) and b.(ii) above, shall be deemed to begin when Your **E-Commerce Activities** are interrupted and ends at the earliest of:

      **(1)**    one hundred-eighty (180) days after the Interruption begins;
      **(2)**    the time when Your **E-Commerce Activities** are resumed; or
      **(3)**    the time when service is restored to You.

**17.**    **Loss** means the definitions set forth in each of the respective Insuring Agreements.

**18.**    **Named Insured** means the entity or entities shown in the Declarations and any **Subsidiary**.

**19.**    **Personal Information** means any information not available to the general public for any reason through which an individual may be identified including, but not limited to, an individual's:

    **a.**    Social security number, driver's license number or state identification number;
    **b.**    Protected health information;
    **c.**    Financial account numbers;
    **d.**    Security codes, passwords, PINs associated with credit, debit or charge card numbers which would permit access to financial accounts; or
    **e.**    Any other nonpublic information as defined in **Privacy Regulations**.

**20.**    **Policy Period** means the period of time from the inception date of this Policy shown in the Declarations to the expiration date shown in the Declarations, or its earlier cancellation or termination date, and specifically excludes any **Extended Reporting Period**.

**21.**    **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

**22.**    **Privacy Regulations** means any of the following statutes and regulations, and their amendments, associated with the control and use of personally identifiable financial, health or other sensitive information including, but not limited to:

    **a.**    The Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Public Law 104-191);
    **b.**    The Health Information Technology for Economic and Clinical Health Act (HITECH) (American Recovery and Reinvestment Act of 2009);
    **c.**    The Gramm-Leach-Bliley Act of 1999;
    **d.**    Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)), but solely for alleged unfair or deceptive acts or practices in or affecting commerce;
    **e.**    The Identity Theft Red Flags Rules under the Fair and Accurate Credit Transactions Act of 2003; or
    **f.**    Any other similar local, state, federal or foreign identity theft or privacy protection statute or regulation.

**23.**    **Ransomware** means any software that is used to demand a ransom payment by: i) restricting access to a **Computer System**; or ii) encrypting Your **Electronic Data** held within a Computer System.

**24.**    **Ransom Demand** means a demand by a third-party actor communicated in an electronic format to You as a request for payment in any form, including virtual currency, to rectify an **Extortion Threat** that is **Discovered** during the Policy Period.

**25.**    **Security Breach** means a privacy breach that includes the acquisition of **Personal Information** held within a **Computer System** or in non-electronic form at or while in the care, custody or control of the **Insured** or

authorized **Third Party** by a person: i) not authorized to have access to such information; or ii) authorized to have access to such information but whose access results in the unauthorized disclosure of such information.

26.    **Subsidiary** means any organization in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors, trustees, managers (if a limited liability company) or persons serving in a similar capacity is owned, in any combination, by one or more **Named Insureds**.

27.    **Suit** means a civil proceeding in which damages to which this Policy applies are claimed against the **Insured**. **Suit** includes:

    **a.**    An arbitration proceeding in which such damages are claimed and to which the **Insured** submits with Our consent; or

    **b.**    Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **Insured** submits with Our consent.

    **Suit** does not include a civil proceeding seeking recognition and/or enforcement of a foreign money judgment.

28.    **Third Party** means any entity that You engage under the terms of a written contract to perform services for You.

29.    **Virus** means any kind of malicious code designed to damage or destroy any part of a **Computer System** (including Your **Electronic Data**) or disrupt its normal functioning.

30.    **Wrongful Act** means any actual or alleged:

    **a.**    **Security Breach**;

    **b.**    Failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing **Personal Information**;

    **c.**    Failure to prevent the transmission of a **Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network that is not rented, owned, leased by, licensed to or under the direct operational control of the **Insured**; or

    **d.**    Failure to provide notification of any actual or potential **Security Breach** if such notification is required by any security breach notification law;

by, or asserted against, an **Insured.**

## SECTION III – LIMITS OF INSURANCE

1.    **Policy Aggregate Limit of Insurance**

The most We will pay for all covered **Loss**, and **Defense Expenses** is the Policy Aggregate Limit of Insurance shown in the Declarations. The Policy Aggregate Limit of Insurance shall be reduced by any payment, including **Defense Expenses**, made under the terms of this Policy.

Upon exhaustion of the Policy Aggregate Limit of Insurance by such payments, We will have no further obligations or liability of any kind under this Policy.  Upon exhaustion of the Policy Aggregate Limit of Insurance, we will work with You to ensure an orderly transfer of Our defense duties, as necessary.

2.    **Aggregate Sublimit(s) of Insurance**

The Aggregate Sublimit(s) of Insurance  are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Any such Aggregate Sublimit(s) of Insurance shall be reduced by the amount of any payment for **Loss** and, if applicable, **Defense Expenses**, under the Insuring Agreement to which such Aggregate Sublimit of Insurance applies. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** or **Defense Expenses** subject to such Sublimit of Insurance.

## SECTION IV – DEDUCTIBLE

Subject to Section III – Limits of Insurance:

**1.**    Under Insuring Agreements 1 - Security Breach Expense, 2 - Extortion Threats and 3 - Replacement or Restoration of Electronic Data, We will pay only the amount of **Loss** which is in excess of the Policy Deductible amount shown in the Declarations.

**2.**    Under Insuring Agreement 4 - Business Income, Contingent Business Income and Extra Expense:

   We will pay only the amount of **Loss** which exceeds the greater of the following deductible amounts:

   **a.**    The Policy Deductible Amount shown in the Declarations; or
   **b.**    The amount of **Loss** incurred during the Time Deductible shown in the Declarations.

**3.**    Under Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties:

   Subject to the applicable limitations set forth in Section III. Limits of Insurance, We will pay only the amount of **Loss** and **Defense Expenses** which is in excess of the Policy Deductible Amount shown in the Declarations resulting from the same **Wrongful Act** or **Interrelated Wrongful Acts**. Such Policy Deductible Amount will be borne by You, self-insured, and at Your own risk.

**4.**    In the event a **Loss** is covered under more than one Insuring Agreement, only the single highest deductible amount applicable to the **Loss** shall be applied.

## SECTION V – DEFENSE AND SETTLEMENT

The provisions contained within this section apply only to Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties.

We shall have the right and duty to select counsel and defend the **Insured** against any **Claim** covered under Insuring Agreement 5.a. - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, even if the allegations of such **Claim** are groundless, false or fraudulent. However, We shall have the right but not the duty to defend the **Insured** against a **Claim** covered under Insuring Agreement 5.b. or 5.c. - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, and We shall have no duty to defend the **Insured** against any **Claim** which is not covered under such Insuring Agreement.

We may, upon the written consent of the **Insured**, make any settlement of a **Claim** which We deem reasonable. If We recommend a settlement of a **Claim** which is acceptable to the claimant, and the **Insured** withholds consent to such settlement, Our liability for all **Loss** and, if applicable any **Defense Expenses**, resulting from such **Claim** will be limited to sixty-percent (60%) of any amount over and above the recommended settlement to which You refuse to consent.  You shall be responsible for forty-percent (40%) of any amount over and above the recommended settlement.  Our liability in this regard is subject to any applicable Deductible and any applicable Limit(s) of Liability.

## SECTION VI – EXCLUSIONS

We will not be liable for **Loss** or **Defense Expenses** directly or indirectly based upon, attributable to or arising out

of:

1.    Lightning, earthquake, hail, volcanic action, wind, smoke, tidal wave or flood, landslide, electromagnetic pulse or other electromagnetic disturbances and/or any Space Weather as classified by NOAA, tornado, or any other act of God or nature.

2.    Any of the following:
   **a.**    War, including undeclared or civil war or civil unrest;
   **b.**    Warlike action by military force, including action hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents;
   **c.**    Insurrection, rebellion, revolution, usurped power or action taken by government authority in hindering or defending against any of these; or
   **d.**    any **Cyber Incident**, **Security Breach**, or other **Wrongful Act** by or on behalf of any government, sovereign, state, or other authority sponsored actor or group that results in, or is carried out in the course of, any of the events in part a, b, or c above.

3.    The dispersal or application of pathogenic or poisonous biological or chemical materials, nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident, however caused.

4.    Bodily Injury or physical damage to or destruction of tangible property, including loss of use thereof.

      **Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. It also means mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person.

      However, **Bodily Injury** does not mean mental anguish or emotional distress resulting directly from a **Security Breach** or **Cyber Incident**.

5.    Any disruption in normal computer function or network service or function due to insufficient capacity to process transactions or due to an overload of activity on a **Computer System** or network. However, this exclusion shall not apply if such disruption is caused by a **Cyber Incident** or **Security Breach**.

6.    Any disruption of i) internet service; or ii) any external telecommunication network;or iii) failure or termination of any core element of internet, telecommunications, or GPS infrastructure that results in a regional, countrywide, or global outage of such infrastructure; or iv) failure of power supply and other utilities unless the provision of power and other utility services is under the **Named Insured's** direct control. However, parts i) and ii) of this exclusion shall not apply if such disruption is caused by a denial of service attack under Paragraph b. of Definition 5. **Cyber Incident**.

7.    Any failure of, reduction in or surge of power.

8.    Any actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) and its amendments, or similar provisions of any federal, state or local statutory or common law.

9.    Any malfunction or failure of any satellite.

10.   Any actual or alleged oral or written publication of material, if done by an **Insured** or at an **Insured's** direction with knowledge of its falsity.

11.   An **Insured's** assumption of liability by contract or agreement, whether oral or written. However, this exclusion shall not apply to any liability that an **Insured** would have incurred in the absence of such contract or agreement.

**12.**      Any actual or alleged patent or trade secret violation, including any actual or alleged violation of the Patent Act, the Economic Espionage Act of 1996 or the Uniform Trade Secrets Act and their amendments.

**13.**      Any of the following:

     **a.**      The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** at any time;

     **b.**      Any request, demand, order or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **Pollutants**; or

     **c.**      Any **Claim** or **Suit** brought by, or on behalf of, any governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, **Pollutants**.

**14.**      Any **Claim**, **Suit** or other proceeding against an **Insured** which was pending or existed prior to the Policy Period or arising out of the same or substantially the same acts, facts, circumstances or allegations which are the subject of, or the basis for, such **Claim**, **Suit** or other proceeding.

**15.**      Any actions or activities related to an **Insured's** practices as an employer including, but not limited to, refusal to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution. This exclusion applies:

     **a.**      Whether the injury-causing event described above occurs before employment, during employment or after employment of that person;

     **b.**      Whether the **Insured** may be liable as an employer or in any other capacity; and

     **c.**      To any obligation to share damages with or repay someone else who must pay damages because of the injury.

However, this exclusion will not apply to any **Claim** resulting directly from a **Privacy Breach** related to the **Personal information** of an **Employee**.

**16.**      Any **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act**, or **Interrelated Wrongful Acts** that any **Insured** became aware of prior to the effective date of the Policy.

**17.**      The same facts, **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act**, or **Interrelated Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any insurance policy of which this Policy is a renewal or replacement.

**18.**      Any criminal, dishonest, malicious or fraudulent act, error or omission, or any willful violation of any statute or regulation committed by an **Insured**, acting alone or in collusion with others. However, with the exception of **Claims** excluded under Exclusion 12., this exclusion shall not apply to any dishonest, malicious or fraudulent act, error or omission committed by an **Employee** which give rise to a **Claim** or **Loss** covered under Insuring Agreements 1 -Security Breach Expense and 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties. This exception does not apply to any **Employee** who is a Chief Executive Officer, Chief Financial Officer, Chief Security Officer, Chief Technology Officer, Chief Information Officer, Risk Manager, General Counsel, owner, general manager or any functionally equivalent positions of the **Insured** or any **Subsidiary**, regardless of title.

With the exception of **Claims** excluded under Exclusion 12, We will defend the Insured against any **Claim** alleging such acts or violations until final and non-appealable adjudication is rendered against that **Insured**. A final and non-appealable adjudication rendered against one **Insured** shall not be imputed to any other **Insured**.

We will not provide indemnification for any **Claim** to which any **Insured** enters a guilty plea or pleads no contest and We will not provide a defense from the time We become aware that any **Insured** intends to so plead.

19.    Any action or proceeding brought by, or on behalf of, any governmental authority or regulatory agency including, but not limited to:

    **a.**    The seizure or destruction of property by order of a governmental authority;

    **b.**    Regulatory actions or proceedings brought by, or on behalf of, the Federal Trade Commission, Federal Communications Commission or other regulatory agency, except when covered under Paragraph c. of Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties; or

    **c.**    The shutdown or seizure of systems or services by a government or regulatory body.

However, this exclusion shall not apply to actions or proceedings brought by a governmental authority or a regulatory agency acting solely in its capacity as a customer of the **Named Insured** or of a **Subsidiary**.

20.    Any costs or expenses associated with upgrading or improving a **Computer System** regardless of the reason.

21.    Any **Claim** brought or alleged by one **Insured** against another, except for a **Claim** brought or alleged by an **Employee** against an **Insured** as a result of a **Security Breach** or **Cyber Incident**.

22.    Fines, penalties or assessments imposed pursuant to contract or agreement, whether oral or written, including, but not limited to, Payment Card Industry (PCI) fines, penalties or assessments. This exclusion shall not apply to the coverage provided under Paragraph c. of Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties.

23.    Any costs related to loss of any virtual currency.

24.    Any actual or alleged restraint of trade, monopolization, unfair trade, price fixing, violation of the Federal Trade Commission Act, the Sherman Antitrust Act, the Clayton Act, including any amendment thereto or any rule or regulation promulgated under any such statute, or any similar foreign, federal, state or local statute, rule or regulation. However, this exclusion shall not apply to a **Claim** alleging unfair or deceptive acts or practices in or affecting commerce under Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)).

25.    **a.**    The purchase or sale of or offer to purchase or sell any securities or any violation of the Securities Exchange Act of 1934 or the Securities Act of 1933 and any amendments thereto or any other foreign, federal, state or local statute, or any rule or regulation promulgated under such statutes, that regulates the offering, sale or purchase of securities.

    **b.**    Any **Claim** brought by any security holder of the **Insured**, in their capacity as such, whether directly, by class action, or derivatively on behalf of the **Insured**.

26.    Any **Claim** arising out of, caused by or related to a "Technology Errors & Omissions Wrongful Act."

For purposes of this exclusion, the following definitions apply:

    **a.**    "Technology Errors & Omissions Wrongful Act" means any negligent act, error or omission, including any negligent act, error or omission resulting in a breach of contract or in a failure of "Technology Products" to perform the function or serve the purpose intended by an **Insured** or by a person or entity for whom the **Insured** is legally liable, in the performance of "Technology Services."

    **b.**    "Technology Services" means the following services performed for others for compensation by an **Insured** or by any other person or entity for whom the **Insured** is legally liable:

        **i.**    analysis, design, integration, wiring, cabling, or conversion of computer and electronic technology systems or networks;

        **ii.**    designing, developing, programming, servicing, distributing, licensing, installing, maintaining and repairing computer software, computer code and computer firmware or hardware;

       **iii.**    education and training in the use of computer hardware or software;
       **iv.**    information services;
       **v.**    computer consulting;
       **vii.**   computer and network security services, including but not limited to providing content filtering, patch administration and security audits;
       **viii.**  internet services; or
       **viii.**  data processing in connection with any of the above listed services, including but not limited to storing, collecting, compiling, processing, mining, conversion, encryption, recording or analysis of data.

    **c.**    "Technology Products" means any computer hardware, firmware, software, or related electronic product, equipment or device, specifically designed or intended for use in connection with any "Technology Services," telecommunication systems or telecommunication service that is created, manufactured, developed, distributed, licensed, leased or sold by the **Insured** or for any **Insured** by others acting under the **Insured's** trade name.

27.    any of the following:

    **a.**    Unlawful or unauthorized collection, harvesting, processing, storage, transfer, distribution or sale of **Personal Information** or other data;

    **b.**    Wiretapping, eavesdropping, improper consent practices, unlawful or unauthorized use of tracking/monitoring/surveillance software tools, or audio or video recording;

    **c.**    Violation of the Illinois Biometric Information Privacy Act or similar provisions of any federal, state, local, or foreign statutory or common law, directive or regulation regulating the collection, handling, use, or storage of biometric data and/or any required disclosures thereof;

    **d.**    failure to comply with mandatory notification or timely disclosure obligations to affected individuals or regulatory authorities for the use of biometric information or other **Personal Information.**

However, sections 25.b and 25.d of this exclusion will not apply to **Defense Expenses** incurred for the:

    **a.**    Failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing identity information; or

    **b.**    Failure to provide notification of any actual or potential Security Breach if such notification is required by any security breach notification law.

## SECTION VII – CONDITIONS

**1.**    **Cancellation and Non-Renewal**

    **a.**  Cancellation by **Named Insured**

    This Policy, or any individual Insuring Agreement, may be cancelled by the **Named Insured** by notifying the Insurer or producer of record by:  written notice provided by mail, fax or email; surrender of the Policy; or verbal notice.  We will cancel this Policy effective upon the date on which notice is received or the Policy is surrendered, or the date of cancellation requested by the **Named Insured**.

    If the **Named Insured** cancels this Policy, the refund will be at least 90% of the pro rata refund.

    **b.**  Cancellation by Insurer

    The Insurer may cancel the Policy by delivering to the **Named Insured** and the producer of record, at the address shown in the Declarations or by digital delivery, written notice stating the actual reason for cancellation and the date cancellation shall be effective, which date shall not be less than ten (10) days after notice if We cancel for nonpayment of premium; or forty-five (45) days after notice if We cancel for any other reason. The mailing of such notice shall be sufficient proof of notice. If We cancel this Policy, the refund will be pro rata.

We will also mail or deliver to any mortgageholder, pledgee or other person shown in this Policy to have an interest in any **Loss** which may occur under this Policy, at their last mailing address known to Us, written notice of cancellation, prior to the effective date of cancellation.

**c.**   Nonrenewal

We may elect not to renew this Policy by mailing or delivering written notice of nonrenewal, stating the reasons for nonrenewal, to the **Named Insured** and the **Named Insured's** producer of record, at their last mailing addresses known to Us. We will also mail to any mortgageholder, pledgee or other person shown in this Policy to have an interest in any **Loss** which may occur under this Policy, at their last mailing address known to Us, written notice of nonrenewal. We will mail or deliver these notices at least forty-five (45) days before the expiration of the Policy.

Otherwise, we will renew this Policy unless:

**i.**   The **Named Insured** fails to pay the renewal premium after We have expressed Our willingness to renew, including a statement of the renewal premium, to the **Named Insured** and the **Named Insured's** producer of record at least twenty (20) days before the expiration date; or

**ii.**   Other coverage acceptable to the **Named Insured** has been procured prior to the expiration date of the Policy.

**2.**   **Changes**

This Policy contains all the agreements between You and Us concerning the insurance afforded. The first **Named Insured** shown in the Declarations is authorized to make changes in the terms of this Policy with Our consent. This Policy's terms can be amended or waived only by endorsement issued by Us and made a part of this Policy.

**3.**   **Examination of Your Books and Records**

We may examine and audit Your books and records as they relate to this Policy at any time during the Policy Period shown in the Declarations and up to three years afterward.

**4.**   **Inspections and Surveys**

We have the right to i) make inspections and surveys at any time; ii) give You reports on the conditions We find; and iii) recommend changes.

We are not obligated to make any inspections, surveys, reports or recommendations, and any such actions We do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And We do not warrant that conditions i) are safe or healthful; or ii) comply with laws, regulations, codes or standards.

**5.**   **Premiums**

The first **Named Insured** shown in the Declarations: i) is responsible for the payments of all premiums; and ii) will be the payee for any return premiums We pay.

**6.**   **Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this Policy may not be transferred without Our written consent, except in the case of death of an individual **Named Insured**.

If You are a sole proprietor and You die, Your rights and duties will be transferred to Your legal representative but only while acting within the scope of duties as Your legal representative. Until Your legal representative is appointed, anyone having proper temporary custody of Your property will have Your rights and duties but only with respect to that property.

**7.    Subrogation**

With respect to any payment made under this Policy, We shall be subrogated to the **Insureds** rights of recovery to the extent of such payment. The **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable Us to bring suit in the **Insured's** name. Any recoveries, less the cost of obtaining them, will be distributed as follows:

**a.**    To You, until You are reimbursed for any **Loss** You sustain that exceed the sum of the Policy Limit of Insurance and the Deductible Amount, if any; and

**b.**    Then to You, until You are reimbursed for that part of the payment equal to the Deductible Amount, if any; and

**c.**    Then to Us, until We are reimbursed for the payment made under this Policy.

**8.    Bankruptcy or Insolvency**

Your bankruptcy or insolvency, or the bankruptcy or insolvency of Your estate if You are a sole proprietor, will not relieve Us of Our obligations under this Policy.

**9.    Representations**

You represent that all information and statements contained in the **Application** are true, accurate and complete.  All such information and statements are the basis for Our issuing this Policy. If We learn that any representations, information or statements were untrue, inaccurate or misleading and fraudulent in nature or material to acceptance of the risk or hazard assumed, the Policy may be cancelled and/or coverage may be denied.

**10.    Changes in Exposure**

**a.    Acquisition or Creation of Another Organization**

If before or during the Policy Period:

**i.**    You acquire securities or voting rights in another organization or create another organization which, as a result of such acquisition or creation, becomes a **Subsidiary**; or

**ii.**    You acquire any organization through merger or consolidation;

then such organization will be covered under this Policy but only with respect to **Wrongful Acts** or **Loss** which occurred after the effective date of such acquisition or creation provided, with regard to Paragraphs a.(i) and a.(ii) above, You:

**(1)**    give Us written notice of the acquisition or creation of such organization within ninety (90) days after the effective date of such action;

**(2)**    obtain Our written consent to extend the coverage provided by this Policy to such organization; and

**(3)**    upon obtaining Our consent, pay Us an additional premium.

**b.    Acquisition of Named Insured**

If during the Policy Period:

**i.**    the **Named Insured** merges into or consolidates with another organization, such that the **Named Insured** is not the surviving organization; or

**ii.**    another organization, or person or group of organizations and/or persons acting in concert, acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors, trustees or managers (if a limited liability company) of the **Named Insured**;

then the coverage afforded under this Policy will continue until the end of the Policy Period, but only with respect to **Claims** arising out of **Wrongful Acts** which occurred prior to the effective date of such merger, consolidation or acquisition.

The full annual premium for the Policy Period will be deemed to be fully earned immediately upon the occurrence of such merger, consolidation or acquisition of the **Named Insured**.

The **Named Insured** must give written notice of such merger, consolidation or acquisition to Us as soon as practicable, together with such information as We may reasonably require.

**c.**    If, before or during the Policy Period, an organization ceases to be a **Subsidiary**, the coverage afforded under this Policy with respect to such **Subsidiary** will continue until the end of the Policy Period but only with respect to **Claims** arising out of **Wrongful Acts** which occurred prior to the date such organization ceased to be a **Subsidiary**.

**11.    Other Insurance**

Under Insuring Agreements 1 - Security Breach Expense, 2 - Extortion Threats, 3 - Replacement or Restoration of Electronic Data:

**a.**    If any covered **Claim** or **Loss** is insured by any other valid policy, then this Policy shall apply only in excess of the amount of any deductible, retention and limit applicable to such other insurance, whether such other policy is stated to be primary, contributory, excess, contingent or otherwise, unless such other policy is written specifically excess of this Policy by reference in such other policy to this Policy's policy number.

**b.**    When this Policy is excess We shall have no duty under Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties to defend the **Insured** against any **Suit** if any other insurer has a duty to defend the **Insured** against that **Suit**.

**c.**    If any covered **Claim** or **Loss** is insured by any other valid policy issued by Us, our liability under this Policy and such other policy combined shall not exceed the amount of the largest applicable Aggregate Limits or Sublimit(s) of Insurance.

**12.    Legal Action Against Us**

No person or organization has a right: i) to join Us as a party or otherwise bring Us into a **Suit** asking for damages from an **Insured**; or ii) to sue Us under this Policy unless all of its terms have been fully complied with.

A person or organization may sue Us to recover on an agreed settlement or on a judgment against an **Insured**, but We will not be liable for damages that are not payable under Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, or that are in excess of the Policy Aggregate Limit of Insurance. If judgment against an **Insured** is not satisfied within thirty (30) days, an action may be brought against an **Insurer**. An agreed settlement means a settlement and release of

liability signed by Us, the first **Named Insured** and the claimant or the claimant's legal representative.

You may not bring any legal action against Us involving **Loss**: i) unless You have complied with all the terms of this Policy; ii) until ninety (90) days after You have filed proof of loss with Us; and iii) unless brought within two (2) years from the date You reported the **Loss** to Us, but in no event shall such an action have to be brought less than one (1) year from the time when the cause of action accrues.

If this action is brought pursuant to Sec. 3 of RCW 48.30, then twenty (20) days prior to filing such an action, You are required to provide written notice of the basis for the cause of action to Us and the Office of the Insurance Commissioner. Such notice may be sent by regular mail, registered mail or certified mail with return receipt requested.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

13. **Separation of Insureds**

Except with respect to the Policy Aggregate Limit of Insurance, and any rights or duties specifically assigned in Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties to the first **Named Insured** this Policy applies separately to each **Insured** against whom **Claim** is made.

14. **Duties in the Event of Claim or Loss**

After a situation that results in, or may result in, a **Loss** covered under this Policy is **Discovered**, You must notify Us in writing as soon as practicable, but not to exceed thirty (30) days from the date **Discovered**, and cooperate with Us in the investigation and settlement of the **Claim** or **Loss**. Additionally:

a.     Under Insuring Agreements 1 – Security Breach Expense, 2 – Extortion Threats, 3 – Replacement or Restoration of Electronic Data, and 4 – Business Income and Extra Expense, You must:

    i.     notify local law enforcement officials;
    ii.    submit to examination under oath at Our request and give Us a signed statement of Your answers; and
    iii.   at Our request, give Us a detailed, sworn proof of loss within one hundred twenty (120) days.

In addition, under Insuring Agreement 2 – Extortion Threats, You must also:

    (1)    determine that the **Extortion Threat** has actually occurred; and
    (2)    with respect to **Ransomware**, make every reasonable effort to access Your **Electronic Data** from backup, if any, and to remediate the cause of the **Ransomware**; and
    (3)    make every reasonable effort to immediately notify Us before making any ransom payment based upon the **Extortion Threat**; and
    (4)    approve any ransom payment based upon the **Extortion Threat**.

b.     Under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, You must:

    i.     immediately record the specifics of the **Claim** and the date Discovered;
    ii.    immediately send Us copies of any demands, notices, summonses or legal papers received in connection with the **Claims**;
    iii.   authorize Us to obtain records and other information; and
    iv.    assist Us, upon Our request, in the enforcement of any right against any person or

organization which may be liable to You because of a **Loss** to which this Policy may also apply.

You will not, except at Your own cost, voluntarily make a payment, assume any obligation or incur any expense without Our consent.

**15.     Automatic Extended Reporting Period**

If the **Named Insured** cancels or non-renews this Policy, or the Insurer cancels or non-renews this Policy for any reason other than for non-payment of premium, the **Insured** will have an automatic, non-cancelable ten (10) day **Extended Reporting Period**. This automatic **Extended Reporting Period** is not available if the **Named Insured** elects an optional **Extended Reporting Period**. If the **Named Insured** obtains another insurance policy that applies to such **Claim** within such ten (10) day period, this automatic **Extended Reporting Period** may apply in excess of such other valid and collectible insurance available.

**16.     Supplemental Extended Reporting Period**

If the **Named Insured** cancels or non-renews this Policy, or the Insurer cancels or  non-renews this Policy for any reason other than for non-payment of premium, the **Named Insured** will have the right to purchase an optional **Extended Reporting Period** for a period of up to one (1) year after this Policy's effective date to immediately follow the effective date of cancellation or nonrenewal.

The optional **Extended Reporting Periods** and their respective additional premiums are stated in the Declarations. The **Insurer** must receive written notice of the optional **Extended Reporting Period** elected together with payment of the applicable additional premium, within either 1) sixty (60) days after the end of the Policy Period or 2) thirty (30) days from the effective date of mailing or deliver of the notification advising You of the availability of, the premium for, and the importance of purchasing optional **Extended Reporting Period**. If the Insurer does not receive payment within such period, the **Insurer** will not be required to provide any optional **Extended Reporting Period**.

Premium for the optional **Extended Reporting Period** will be fully earned on the effective date thereof. Once in effect, the optional **Extended Reporting Period** may not be canceled.

**17.     Valuation – Settlement**

All premiums, limit(s) of insurance, deductible amounts, **Loss** and any other monetary amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is agreed to or another component of **Loss** under this Policy is expressed in any currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is entered, settlement amount is agreed upon or the other component of **Loss** is due, respectively.

    **a.**    With respect to Loss covered under Insuring Agreement 4 – Business Income, Contingent Business Income and Extra Expense, the amount of "business and contingent business income" will be determined based on consideration of:

        **i.**    the net income generated from Your **E-commerce Activities** before the **Interruption** occurred;

        **ii.**    the likely net income generated by Your **E-commerce Activities** if no **Interruption** had occurred, but not including any net income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the **Cyber Incident** on customers or on other businesses;

        **iii.**    the operating expenses, including payroll, necessary to resume Your **E-commerce Activities** with the same quality of service that existed before the **Interruption**; and

iv.    other relevant sources of information, including Your financial records and accounting procedures, bills, invoices and other vouchers, and debts, liens and contracts.

However, the amount of "business and contingent business income" will be reduced to the extent that the reduction in the volume of business from the affected **E-commerce Activities** is offset by an increase in the volume of business from other channels of commerce such as via telephone, mail or other sources.

**b.**    With respect to Loss covered under Insuring Agreement 4 – Business Income, Contingent Business Income and Extra Expense, the amount of "extra expense" will be determined based on:

i.    necessary expenses that exceed the normal operating expenses that would have been incurred in the course of Your **E-commerce Activities** during the period of coverage if no **Interruption** had occurred.  We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the period of coverage once Your **E-commerce Activities** are resumed; and

ii.    necessary expenses that reduce the "business and contingent business income" **Loss** that otherwise would have been incurred during the period of coverage.

**18.**    **Confidentiality**

Under Insuring Agreement 2 - Extortion Threats, **Insureds** must make every reasonable effort not to divulge the existence of this coverage.

**19.**    **Territory**

This Policy covers **Wrongful Acts, Security Breaches, Cyber Incidents** and **Extortion Threats** which occur anywhere in the world. However, **Suits** must be brought in the United States of America (including its territories and possessions).

**20.**    **Policy Bridge – Discovery Replacing Loss Sustained**

If this Policy replaces insurance that provided You with an extended period of time after cancellation or nonrenewal in which to **Discover Loss** resulting directly from any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** and which did not terminate when this Policy became effective:

We will not pay for any **Loss** resulting directly from any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** that occurred during the Policy Period of that prior insurance which is **Discovered** during such extended period of time, unless the amount of that **Loss** exceeds the Limit of Insurance and Deductible Amount of that prior insurance. In that case, We will pay for the excess **Loss** subject to the terms and conditions of this Policy.

Condition 11 – Other Insurance does not apply to this condition.

Policy Number: FLY-CB-DU1RCVKXK-003
Issued Date:    May 02, 2024
Effective Date:  May 06, 2024

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

_____
(signature)

Peter Maloney -

Secretary

_____
(signature)

Torben Ostergaard -

President

Policy Number:         FLY-CB-DU1RCVRXK003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TRADE OR ECONOMIC SANCTIONS

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**


This insurance does not provide any coverage, and We shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited, to those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).


All other terms and conditions remain unchanged.

Policy Number:                FLY-CB-DU1RCVRXK0003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# COMPUTER AND FUNDS TRANSFER FRAUD

**Computer And Funds Transfer Fraud Coverage Limit:**      *$1000000.00*
**Computer And Funds Transfer Fraud Deductible:**          *$5000.00*

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

With regard to this Computer And Funds Transfer Fraud endorsement, the provisions of the Policy to which this endorsement is attached remain unchanged and apply, unless modified by this endorsement.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.**    The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS:**

   **Computer And Funds Transfer Fraud**

   **a.**  Subject to the Computer and Funds Transfer Fraud Coverage Limit and Deductible set forth above, We will pay for:

      **i.**   **Loss** resulting directly from a fraudulent:

         **1.**  Entry of **Electronic Data** or **Computer System** into; or
         **2.**  Change of **Electronic Data** or **Computer System** within

         a **Computer System**, by a person or organization without authorization to access such **Computer System**, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **a.i.(1)** and **a.i.(2):**

            **a.**  **Your** money, securities or other property to be transferred, paid or delivered; or
            **b.**  Your account at a financial institution to be debited or deleted, or

      **ii.**  **Loss** resulting directly from a **Fraudulent Instruction** directing a financial institution to debit your **Transfer Account** and transfer, pay or deliver money or securities from that account

      that is first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**.

   **b.**  As used in Paragraph **a.i.,** "fraudulent entry" or "fraudulent change" of **Electronic Data** or **Computer Program** shall include such entry or change made by an **Employee** acting, in good faith, upon a **Fraudulent Instruction** received from a computer software contractor who has a written agreement with You to design, implement or service **Computer Programs** for a **Computer System** covered under this Insuring Agreement.

**II.**   Solely with respect to the coverage afforded under this endorsement:

SP WA 80 02 23

Policy Number:          FLY-GB-Du1RGvKxKJ003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

 

    **a. Computer Program** means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enables the computer or devices to receive, process, store or send your **Electronic Data**.

    **b. Loss** means:

        **1.** In Paragraph **I.a.i.:**

            **(a) Your** money, securities or other property fraudulently transferred, paid or delivered; or

            **(b)** Money or securities fraudulently debited or deleted from Your account at a financial institution.

        **2.** In Paragraph **I.a.ii.,** transferring, paying or delivering money or securities from Your **Transfer Account**.

    **c. Fraudulent Instruction** means:

        **(1)** With regard to Paragraph **I.a.ii.:**

            **(a)** A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instruction directing a financial institution to debit Your **Transfer Account** and to transfer, pay or deliver money or securities from that **Transfer Account**, which instruction purports to have been issued by You, but which in fact was fraudulently issued by someone else without Your knowledge or consent.

            **(b)** A written instruction issued to a financial institution directing the financial institution to debit Your **Transfer Account** and to transfer, pay or deliver money or securities from that **Transfer Account**, through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by You, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

        **(2)** With regard to Paragraph **I.b.:**

            A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic, written or voice instruction directing an **Employee** to enter or change **Electronic Data** or **Computer Programs** within a **Computer System** covered under this Insuring Agreement, which instruction in fact was fraudulently issued by Your computer software contractor.

    **d. Transfer Account** means an account maintained by you at a financial institution from which You can initiate the transfer, payment or delivery of **Money** and **Securities**:

        **(1)** By means of computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instructions; or

        **(2)** By means of written instructions establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

**III.**    The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance**:

    The most We will pay for all Loss covered under the Computer and Funds Transfer Fraud Insuring

SP WA 80 02 23

Policy Number:                FLY-CB-DU1RCVRXKJ003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

Agreement is the Computer and Funds Transfer Fraud Sublimit of Insurance shown above, which is part of, not in addition to the Policy Aggregate Limit of Insurance set forth in the Declarations to this Policy. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

**IV.**    Paragraph **1.** of **Section IV – Deductible** is deleted in its entirety and replaced with the following:

    **1.**    Under Insuring Agreements **1.** Security Breach Expense, **2.** Extortion Threats, **3.** Replacement Or Restoration Of Electronic Data, and Paragraph **I.a.** of this endorsement:

    We will pay only the amount of **Loss** which is in excess of the Policy Deductible Amount shown above.

**V.**    The following is added to **SECTION VI – EXCLUSIONS:**

    **1.**    We will not be liable for **Loss** based upon, attributable to, arising out of or resulting from:

        i.    A fraudulent:

            1.    Entry of **Electronic Data** or **Computer Program** into; or
            2.    Change of **Electronic Data** or **Computer Program** within

        a **Computer System**, by a person or organization with authorized access to such **Computer System**, except when covered under Paragraph **I.b.**

        ii.    The use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

        iii.    The giving or surrendering of property in any exchange or purchase.

        iv.    An **Employee** or financial institution acting upon any instruction to:

            1.    Transfer, pay or deliver  money, securities or other property; or
            2.    Debit or delete Your account;

        which instruction proves to be fraudulent, except when covered under Paragraph **I.b.**

    **2.**    We will not be liable for **Loss**, or that part of any **Loss**, the proof of which as to its existence or amount is dependent upon:

        i.    An inventory computation; or
        ii.    A profit and loss computation.

**VI.**    The introductory statement to paragraph **a**. of Condition **14. Duties in the Event of Claim or Loss** in **SECTION VII – CONDITIONS** is deleted in its entirety and replaced with the following**:**

    **a.** Under Insuring Agreements **2.** Extortion Threats, **3.** Replacement Or Restoration Of Electronic Data and this Computer Funds Transfer Fraud Insuring Agreement, you must:

SP WA 80 02 23

Policy Number:               FLY-GB-DU1RCvRXK-003
Endorsement Issued Date:     May 02, 2024
Endorsement Effective Date: May 06, 2024

All other terms and conditions remain unchanged.

SP WA 80 02 23

Policy Number:        FLY-CB-Du1RGvKxK003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INCREASE OF OR ELIMINATION OF BUSINESS AND CONTINGENT BUSINESS INCOME AND EXTRA EXPENSE SUBLIMIT

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

**SCHEDULE**

| | |
|---|---|
| **Effective Date of Endorsement:** | May 06, 2024 |
| **Business and Contingent Business Income and Extra Expense Sublimit:** | $1,000,000.00 |
| **Premium**: | $600.00 |

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

The following sentence is added to Paragraph 2. Aggregate Sublimit(s) of Insurance of **SECTION III – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance**:

Insuring Agreement 4 – Business and Contingent Business Income and Extra Expense: is the Business Income and Extra Expense Aggregate Sublimit of Insurance, if any, shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

Policy Number:                    FLY-CB-DU1RCvRXK003
Endorsement Issued Date:     May 02, 2024
Endorsement Effective Date:  May 06, 2024

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SOCIAL ENGINEERING ENDORSEMENT

**Social Engineering Coverage Limit:** $100000.00
**Social Engineering Deductible:**  $10000.00

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Social Engineering Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.**   The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Social Engineering**

Subject to the Social Engineering Coverage Limit and Deductible set forth above, We will pay for **Social Engineering Loss** resulting directly from a **Social Engineering Incident** that is first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**.

With respect to this Social Engineering Insuring Agreement:

**a.**   **Money** means currency, coins or bank notes in current use and having a face value, travelers' checks, register checks and money orders held for sale to the public. The term **Money** does not include digital currency or other negotiable and nonnegotiable instruments or contracts representing either **Money** or property.

**b.**   **Securities** mean negotiable and non-negotiable instruments or contracts representing either Money or property.

**Securities** does not include **Money**.

**c.**   **Social Engineering Incident** means the intentional misleading of an **Insured** to transfer **Money** to a person, place or account beyond the **Named Insured's** control resulting directly from the **Named Insured's** employee's good faith reliance upon an instruction transmitted via email, purporting to be from:

**i.**   a natural person or entity who exchanges, or is under contract to exchange, goods or services with the **Named Insured** for a fee (other than a financial institution, asset manager, broker-dealer, armored motor vehicle "named insured" or any similar entity); or

**ii.**   an employee of the **Named Insured**;

but which contained a fraudulent and material misrepresentation and was sent by an imposter.

SP WA 91 02 23                                                                                        Page 1 of 3

Policy Number:                FLY-CB-DU1RCVRXK0U3
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

As a condition precedent to coverage under this Social Engineering Endorsement, the **Named Insured** must have an established and documented funds transfer request verification procedure and that procedure must have been followed before acting upon any instruction.

    **d.**  **Social Engineering Loss** means the loss of **Money** as a result of a **Social Engineering Incident**.

       **Social Engineering Loss** does not include indirect and/or consequential loss.

**II.**  The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

The most We will pay for all Loss covered under the Social Engineering Insuring Agreement is the Social Engineering Aggregate Sublimit of Insurance, if any, shown above or in the Declarations., which are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations of liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

**III.**  The following is added to **SECTION III – DEDUCTIBLE**:

Under the Social Engineering Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible shown above, or in the Declarations.

**IV.  SECTION V – EXCLUSIONS** is amended to include:

We will not be liable for **Social Engineering Loss** resulting from a **Social Engineering Incident** based upon, attributable to or arising out of:

**1.**  An actual or alleged infringement of, violation of, misappropriation of or assertion of any right to or interest in any:

    **a.**  Patent, copyright, trademark, trade dress, certification mark, collective mark, service mark, expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade secret or other intellectual property right by or on behalf of any **Insured**; or

    **b.**  Software or computer code or its source content or material by or on behalf of any **Insured**.

**2.**  A fraudulent, dishonest or criminal act by any **Employee** or authorized representative of the **Named Insured**, whether acting alone or in collusion with others.

**3.**  The establishment of any credit or similar promise to pay, or to any party's use of or acceptance of any credit card, debit card or similar instrument, whether or not genuine.

**4.**  Any investment or ownership in any corporation, partnership, real property, or similar instrument, whether or not such investment is genuine.

**5.**  A kidnap, ransom or other extortion payment surrendered as a result of a threat to do bodily harm to any natural person or a threat to harm, take, or transfer property.

Policy Number:                    FLY-GB-DU1RCVRXK003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

All other terms and conditions remain unchanged.

Policy Number:                    FLY-CB-DU1RCVRXK003
Endorsement Issued Date:   May 02, 2024
Endorsement Effective Date: May 06, 2024

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TELECOMMUNICATIONS FRAUD ENDORSEMENT

**Telecommunications Fraud Coverage Limit:**  $50000.00

This endorsement modifies insurance provided under the following:

**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Telecommunications Fraud Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

This endorsement extends certain coverages. The headers in this endorsement are only for convenience. Read the entire policy carefully to determine rights, duties and what is and is not covered.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

I.       The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

      **Telecommunications Fraud:**

      Subject to the Telecommunications Fraud Coverage Limit set forth above and any Deductible specified in the Declarations to this policy, We will pay for any monetary **Loss** sustained by **You,** including but not limited to phone bills, first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VII – CONDITIONS**, directly resulting from an intentional unauthorized access  to  Your **Telephone System** by a third party.

      With respect to this Telecommunications Fraud Insuring Agreement:

      a. **Loss** solely means the monetary cost of unauthorized calls or unauthorized use of **Your Telephone System's** bandwidth.

      b. **Telephone System** means the VoIP phone system directly under **Your** control.

II.      The following is added to **SECTION III – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

      The most We will pay for all Loss covered under the Telecommunications Fraud Insuring Agreement is the Telecommunications Fraud Aggregate Sublimit of Insurance, if any, shown above or in the Declarations., which are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations of liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

Policy Number:                    FLY-CB-Du1RCvRxK003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**III.**    The following is added to **SECTION IV – DEDUCTIBLE**

Under the Telecommunications Fraud Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible shown in the Declarations.

All other terms and conditions remain unchanged.

Policy Number:              FLY-CB-DU1RGvRXK003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# HARDWARE REPLACEMENT COSTS ENDORSEMENT

**Hardware Replacement Costs Coverage Limit:**   $50000.00

This endorsement modifies insurance provided under the following:

**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Hardware Replacement Costs Endorsement, all provisions of the Policy to which this endorsement is attached, as all terms and conditions, remain unchanged and applicable.

This endorsement extends certain coverages. The headers in this endorsement are only for convenience. Read the entire policy carefully to determine rights, duties and what is and is not covered.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

I.      The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

      **Hardware Replacement Costs:**

      Subject to the Hardware Replacement Costs Coverage Limit set forth above and any Deductible specified in the Declarations to this policy, We will pay for **Loss** directly resulting from a **Cyber Incident** first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VII – CONDITIONS**, to mitigate the potential of a future **Cyber Incident** or **Security Breach.**

      With respect to this Hardware Replacement Costs Insuring Agreement:

      a. **Loss** means the cost to replace hardware, including but not limited to, computers or any associated devices or equipment operated by, and either owned by or leased to, the **Insured** that are unable to function as intended due to corruption or destruction of software or firmware.

      b. **Loss** does not include any sums related to labor costs associated with installing, connecting or setting up the hardware.

II.     The following is added to **SECTION III – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

      The most We will pay for all Loss covered under the Hardware Replacement Costs Insuring Agreement is the Hardware Replacement Costs Aggregate Sublimit of Insurance, if any, shown above or in the Declarations, which are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations of liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

Policy Number:           FLY-GB-DU1RGVKXK003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**III.**      The following is added to **SECTION IV – DEDUCTIBLE:**

Under the Hardware Replacement Costs Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible shown in the Declarations.

**IV.**      Exclusion **4** in **SECTION VI – EXCLUSIONS** is deleted in its entirety and replaced with the following:

**4.   Bodily Injury**

**Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. It also means mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person.

However, **Bodily Injury** does not mean mental anguish or emotional distress resulting directly from a **Security Breach**.

All other terms and conditions remain unchanged.

SP WA 86 05 22                    Page 2 of 2                    Spinnaker Insurance Company

Policy Number:                   FLY-CB-Du1RcvRXK003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WEBSITE MEDIA CONTENT LIABILITY ENDORSEMENT

**Website Media Content Liability Coverage Limit:** $1000000.00
**Website Media Content Liability Deductible:**       $5000.00


This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**


Unless modified by this Website Media Content Liability Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

I.     The following Insuring Agreement is added to the end of **SECTION I – INSURING AGREEMENTS**:

**Website Media Content Liability**

Subject to the Website Media Content Liability Coverage Limit and Deductible set forth above, We will pay for Loss that the Insured becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim** that is **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VII – CONDITIONS**, for one or more of the following acts first committed on or after the retroactive date and before the end of the Policy Period in the course of Your display of **Media Material** on Your website or on social media web pages created and maintained by or on behalf of You:

a.   invasion of or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness;

b.   plagiarism, piracy or misappropriation of ideas under implied contract;

c.   infringement of copyright;

d.   infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, slogan, service mark, service name; or

e.   improper deep-linking or framing within electronic content.

With respect to this Website Media Content Liability Insuring Agreement:

a.   **Media Material** means any information in electronic form, including words, sounds, numbers, images, or graphics and shall also include advertising, video, streaming content, webcasting, online forums, bulletin boards and chat room content, but does not mean computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

Policy Number:        FLY-CB-DU1RCVRXK003
Endorsement Issued Date:    May 02, 2024
Endorsement Effective Date: May 06, 2024


## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

1. **Media Material** means any information in electronic form, including words, sounds, numbers, images, or graphics and shall include advertising, video, streaming content, web-casting, online forums, bulletin boards and chat room content, but does not mean computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

II.    Exclusions Applicable to the Website Media Content Liability Insuring Agreement:

We will not be liable for any **Claim** resulting from an act based upon, attributable to or arising out of:

1. An actual or alleged infringement of, violation of, misappropriation of or assertion of any right to or interest in any:

   a. Patent, copyright, trademark, trade dress, certification mark, collective mark, service mark, expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade secret or other intellectual property right by or on behalf of any **Insured,** provided that this Exclusion does not apply to a claim resulting from an act based upon, attributable to or arising out of infringement of copyright, or infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, slogan, service mark, service name in the course of Your display of **Media Material** on Your website or on social media web pages created and maintained by or on behalf of You; or

   b. Software or computer code or its source content or material by or on behalf of any **Insured**.

III.    The following is added to **SECTION III – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance**:

The most We will pay for all Loss covered under the Website Media Content Liability Insuring Agreement is the Website Media Content Liability Sublimit of Insurance shown above, which is part of, not in addition to the Policy Aggregate Limit of Insurance set forth in the Declarations to this Policy. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.


All other terms and conditions remain unchanged.

**POLICYHOLDER DISCLOSURE**

**NOTICE OF TERRORISM INSURANCE COVERAGE**

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined, in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Where coverage is provided under this Policy, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

**Your premium <u>will</u> include the additional premium for terrorism, as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

<u>**DISCLOSURE OF PREMIUM**</u>

Your premium for terrorism coverage is: $ 2   (This charge/amount is applied to obtain the final premium).

You may choose to reject the offer by selecting the rejection option below.  If you choose to reject the offer, Your Policy will be modified to exclude the described coverage.  If you choose to accept this offer, you do not need to do anything further and such coverage will be provided as described herein.

<u>**REJECTION OF TERRORISM INSURANCE COVERAGE**</u>

☐   By clicking this box, I affirm that I have read this Notice and hereby choose to decline to purchase coverage for certified acts of terrorism, as defined in Section 102(1) of the Act.  I understand that I will not have coverage for any losses resulting from any certified acts of terrorism and that an exclusion of certain terrorism losses will be made part of this Policy.

*Named Insured's consent to this Form provided electronically*       Sarah Streck

Policyholder/Applicant's Signature                              Named Insured

Sarah Streck                                       *Spinnaker Insurance Company*

Print Name of Policyholder/Applicant                 Insurance Company

Date: May 02, 2024                      Policy Number: FLY-CB-DU1RCVKXK-003

**POLICY DOCUMENTATION DELIVERY METHOD SELECTION FORM**

Spinnaker Insurance Company is required by law to obtain Your consent to engage in electronic delivery of Your policy and related forms. You may:

- Select ONLY electronic delivery;

- Select ONLY paper delivery;

- Select BOTH electronic delivery and paper delivery; or

- Withdraw Your previous consent to receive electronic delivery.

Please indicate Your choice from the options below. Your selection applies to You and any other insureds entitled to receive copies of such forms under the policy.

☒ **ELECTRONIC DELIVERY ONLY**

I select electronic delivery of the form(s) indicated below. I acknowledge that in order to receive electronic delivery of the form(s) below, I must have internet and e-mail access. I acknowledge that I will not receive paper copies of these form(s), unless I notify Spinnaker Insurance Company or my agent/broker of my decision to entirely withdraw electronic consent or modify my selection to also include paper delivery.

☒ Policy

☒ Notices of Cancellation and Nonrenewal

☒ Other forms related to my policy

☐ **PAPER DELIVERY ONLY**

I select paper delivery of my policy and all related forms. I acknowledge that I will only receive paper copies of such forms.

☐ **BOTH ELECTRONIC DELIVERY AND PAPER DELIVERY**

I select the option to receive both electronic and paper delivery of my policy and all related forms.

☐ **WITHDRAWAL OF CONSENT OF ELECTRONIC DELIVERY**

I withdraw my consent to receive electronic delivery of my policy and/or related forms. In the future, I will only receive paper copies of such forms.

**DISCLOSURE**

If You elect to have Your insurance policy and related documents sent to You by electronic delivery, it is Your responsibility to maintain internet and e-mail access and to update Your email address should it change at any time during the life of the policy. Further, Your election to have Your insurance policy and related documents transmitted to You electronically shall remain in effect until You notify:

Spinnaker Insurance Company
c/o *Boost Insurance Agency, Inc.*
*22 W 21st Street. 7th Floor*
*New York, NY 10010*

in writing of Your withdrawal of such consent.

Sarah Streck
_____
**Name of Individual to Receive Documents by Electronic Delivery**

sstreck@connelly-law.com
_____
**E-mail Address of Individual to Receive Documents by Electronic Delivery**

Sarah Streck
_____
**First Named Insured**

Sarah Streck
_____
**Print Name of First Named Insured's Authorized Representative**

*Named Insured's consent to this Form provided electronically*
_____
**Signature of First Named Insured's Authorized Representative**

May 02, 2024
_____
**Date**

**Spinnaker Privacy Policy**

**Last Updated: October 2023**

This privacy policy applies to Spinnaker Insurance Company, and its subsidiaries, Spinnaker Specialty Insurance Company and Mainsail Insurance Company (collectively, "**Spinnaker**," "**we**," "**our**" and "**us**"). This privacy policy applies to information collected offline and information obtained from third parties (collectively "**Services**").

This privacy policy describes the information we collect about you, how we use this information and the choices you have regarding such use, and other important information regarding our privacy practices. If you have any questions or comments about this privacy policy or the ways in which Spinnaker uses the information we collect about you, please contact us using the information provided in the contact section below.

Please note the Spinnaker Consumer Privacy Notice applies to information that we collect about individuals who seek, apply for, or obtain our insurance products or services for personal, family or household purposes, whether that information comes through our Services or any other means. The information contained in this privacy policy is not intended to amend, replace, contradict, change, or otherwise affect the policies outlined in the Spinnaker Consumer Privacy Notice. Please read the Spinnaker Consumer Privacy Notice for information about your rights with respect to the information collected in connection with seeking, applying for, or obtaining insurance products or services from us. If you are a California consumer, you may find the California Financial Information Privacy Act Notice after our Consumer Privacy Notice.

Before engaging with us, submitting information to us, or buying or using our Services, please review this privacy policy carefully.

You may print or download a pdf version of this privacy policy.

**Table of Contents**

1.      We may collect your information when you use our Services, when you apply for products, or from third parties.

2.      We may collect information you provide us when you use our Services.

3.      We may collect your information when you apply for or use our Services.

4.      We may collect your personal information from third parties.

5.      We may use your information to provide you with our Services.

6.      We may retain your information for our business purposes.

7.      We may share your information to provide you with our Services.

8.      You can manage your browser cookies.

9.      We do not respond to Do Not Track signals.

10.     We may provide links to other companies.

11.     We may record calls to our call centers and in-house agents.

12.     We encourage caution in posting information publicly.

13.     We take measures to protect your personal information.

14.     Our Services are not intended for minors.

15.     We provide you with additional disclosures relating to various state privacy laws.

16.     You may have additional rights under various state privacy laws.

17.     Victims of domestic violence may have confidentiality rights.

18.     We are based in the United States.

19.     We may change this privacy policy.

20.     Spinnaker provides you with a Consumer Privacy Notice.

21.     Spinnaker provides you with a California Financial Information Privacy Act Notice.

22.     You may contact us.

**1.   We may collect your information when you use our Services, when you apply for products, or from third parties.**

We may collect information from you in various ways, including the following:

- We collect information you provide us when you use our Services;

- We collect information when you apply for or use our Services; and

- We collect information from third parties, such as our service providers, data providers, or partners.

**2.   We may collect information you provide us when you use our Services.**

When you use our Services, we may collect the information you provide us, for example, when you:

- Ask a question;

- Email us or modify your account;

- Conduct transactions;

- Apply for Services;

- Begin or complete a form;

- Modify your coverage;

- Inquire about the status of a claim;

- Contact customer support; and

- Provide feedback or a complaint.

**3.   We may collect your information when you apply for or use our Services.**

We may collect information when you apply for or use our Services, including:

- Name, email address, postal address, or residential property address;

- Driver's license number;

- Date of birth;

- Your signature, phone number, and family member information;

- Payment card information, financial account information, or insurance policy information;

- Age, gender, marital status, and veteran or military status;

- Payment history, claims history, property information and records;

- Records of Services requested or purchased;

- Lender information, and information necessary to determine discount qualification and eligibility; and

- Other information you provide to us.

Some forms on our Services may require that you provide certain information to submit the form. You may choose not to provide information in those cases, but this may prevent you from being able to use certain features of our Services.

**4.   We may collect your personal information from third parties.**

We may collect personal information about you from third parties. In some instances, we may combine the personal information we collect about you from third parties with personal information we collect from you. We also may obtain personal information about you from consumer reporting agencies or insurance support organizations as well as from

commercially available sources such as data aggregators and public databases. Depending on your relationship with us, this personal information we collect from third parties may include:

- Name, email address, postal address, or residential property address;
- Information about your property, including its condition; or
- Demographic information.

Additionally, if you purchase insurance through an insurance agent or agency, we may receive personal information from the agent or agency about you, including information listed in Section 3. We may also receive information about you from public databases or third parties from whom we have obtained data, among other sources. We may combine this information with other information we have about you.

**5.  We may use your information to provide you with our Services.**

We may use your information in a variety of ways, including to:

- Complete an application on your behalf;
- Communicate insurance information to a lender or mortgagor designated by you;
- Service your policy;
- Intake and process claims;
- Respond to your requests, questions, or comments;
- Send billing notices to you and your lender, mortgagor, or lender service company;
- Communicate with you and others;
- Develop new Services;
- Improve our existing Services;
- Address problems and review the usage and operations of our Services or business;
- Improve our Services, content, products, and offerings;
- Protect the security and integrity of our Services and our business, including to detect fraud or illegal activities;
- Enforce our terms of use and other applicable policies;
- Conduct actuarial or research studies;
- Protect and defend our rights and property or the rights of third parties; and
- As otherwise described to you at the point of collection.

**6.  We may retain your information for our business purposes.**

We may retain and use your information in accordance with our records retention schedule, as required or permitted by law, to comply with our legal obligations, to resolve disputes, and to enforce our agreements. We also retain your information as needed to provide Services to you and while you maintain an account with us.

**7.  We may share your information to provide you with our Services.**

In addition to sharing your information as described at time of collection, we may share your information with the following persons or entities or in the following circumstances, among others:

- When we have your consent or at your direction;
- To perform or provide the Services you requested;
- With a parent, subsidiary, or affiliate entity within the Spinnaker corporate family, as permitted by law;

- With third parties that play a role in an insurance or other transaction such as insurance companies, payment vendors, inspection companies, loss control companies, claims adjusters and other claims-related companies, contractors, investigators, attorneys and other third parties who provide services relating to your claim or a service that we offer;

- With participating insurance support organizations (information obtained from a report prepared by an insurance-support organization may be retained by the insurance-support organization and disclosed to other persons), reinsurance companies, and regulators;

- With our authorized agents and brokers who sell or facilitate the sale of our Services;

- With our vendors, as needed to perform their functions for us;

- With third parties to provide you with a product or service, as permitted by law;

- With legal entities, if required by law, or a regulatory authority or at the request of governmental, law enforcement, or regulatory authorities;

- When we believe such sharing is necessary, such as to protect the rights, property, life, security, or safety of Spinnaker or others; and

- In the case of a corporate transaction, such as a merger, acquisition, or divestiture.

**8.  You can manage your browser cookies.**

Most internet browsers allow you to block, manage, or delete cookies or local storage through the privacy features of your browser. Please refer to the help section of your browser or mobile device for additional information. Your browser may also offer add-ons, plugins, or extensions to manage local storage objects, scripts, or similar technologies mentioned in our privacy policy. Please note that if you block cookies or similar technologies, you may not be able to use the full functionality of our Services. For further information about cookies and similar technologies, including how to manage and delete cookies on your device, you can visit All About Cookies.

**9.  We do not respond to Do Not Track signals.**

Our Services do not currently respond to Do Not Track signals. To learn more about Do Not Track signals, you may visit the Future of Privacy Forum's website for additional information.

**10.  We may provide links to other companies.**

Our Services, other materials, and products may contain references or links to third-party websites and services, including references and links to third parties that accept and process your payments to us. We are not responsible for any third party's data collection or privacy practices, and we have no control over what information third parties track or collect. Any access to and use of such linked websites is not governed by this privacy policy but instead is governed by the privacy policies of those third-party websites. We encourage you to review the privacy policies posted on those third-party websites for further information.

**11.  We may record calls to our call centers and in-house agents.**

We may record or monitor our conversations with you if you call our customer service centers or if our customer service centers or agents call you. We may use these recordings for business records, training, quality assurance, fraud prevention, and other business purposes. We may use your voiceprint for verification or anti-fraud purposes when you call our call centers or in-house agents.

**12.  We encourage caution in posting information publicly.**

Our Services may permit you to post or submit content publicly. If you choose to submit content containing personal information to any public area of our Services, your content will be accessible by anyone, including us. We encourage you to exercise caution when making decisions about what you disclose publicly.

**13.  We take measures to protect your personal information.**

We may take reasonable measures designed to secure your personal information. However, we cannot guarantee that

your personal information will not be lost, accessed without authorization, disclosed, altered, or destroyed. Any information you provide to us is at your own risk.

**14. Our Services are not intended for minors.**

Our Services are not intended for children under the age of 13. We do not knowingly collect any personal information from anyone under the age of 13. You must be 18 years of age or older to submit any information to us.

**15. We provide you with additional disclosures relating to various state privacy laws.**

You may have additional privacy rights that we describe in further detail below.

Various state comprehensive privacy laws give individuals the right to know what personal information is collected about them, including whether it is being sold or disclosed to third parties. These state privacy laws also grant these individuals certain rights and prevent companies from retaliating against consumers for exercising those rights. This notice applies to all activities of Spinnaker, including those activities that occur online and offline.

The types of personal information we have collected or disclosed in the last twelve (12) months or beyond depend on your relationship with Spinnaker. If the nature of your relationship with Spinnaker changes, an additional data privacy notice may apply.

The personal information that Spinnaker collects about you may include the following categories of personal information:

1. Identifiers, such as real name, alias, postal address, unique personal identifier, online identifier, email address, account name, driver's license number, passport number, or other similar identifiers;

2. Personal information described in California Civil Code Section 1798.80(e), such as signature, physical characteristics or description, telephone number, insurance policy number, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information;

3. Characteristics of protected classifications under California or federal law, such as race, gender, physical or mental disability, and religion;

4. Commercial information, such as records of personal property, Services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies;

5. Biometric information, such as your voiceprint when you call our call centers;

6. Internet or other electronic network activity information, such as browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement;

7. Geolocation data, such as information used to identify your physical location, including geolocation data collected in connection with your use of our Services;

8. Audio, electronic, visual, thermal, olfactory, or similar information;

9. Professional or employment-related information, such as information collected from job applications and resumes;

10. Education information, such as information collected from job applications, transcripts, or resumes;

11. Inferences, such as those drawn from any of the information Spinnaker collects to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes; and

12. Sensitive personal information, such as driver's license number, passport number, account log-in, financial account, debit card, or credit card number in combination with any required security or access code, password, or credentials allowing access to an account, precise geolocation, racial or ethnic origin, religious beliefs, mental or physical health condition or diagnosis, sex life or sexual orientation, or citizenship or immigration status.

| Types of Personal Information | Do we collect it? | Categories of Sources | Purposes of Collection | Do we disclose it to third parties? | Purposes of Disclosure | Categories of Third Parties PI Disclosed To | Do we sell it to third parties? | Purposes of Selling | Do we Share for Behavioral Advertising? | Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| Identifiers | Yes | You, publicly available databases, government databases, data aggregators, affiliates, subsidiaries, agents or other producers, financial service providers, and other service providers | Respond to questions, requests, complaints, and emails; provide customer service; provide Services to you; set up, manage accounts; verify your identity; regulatory reporting; and update our records | Yes | Customer service, account set up, management, or servicing, data verification services, regulatory reporting requirements | Service providers that provide us with customer service, account set up, management, or servicing or data verification services, regulatory authorities | No | Not applicable | No | Generally 1 years but also subject to data retention schedules |
| Personal information described in California Civil Code Section 1798.80(e) | Yes | You, publicly available databases, government databases, data aggregators, affiliates, subsidiaries, agents or other producers, financial service providers, and other service providers | Respond to questions, requests and emails; provide customer service; set up, manage accounts; verify your identity; regulatory reporting; and update our records | Yes | Customer service, account management, servicing or data verification services, regulatory reporting requirements | Service providers that provide us with customer service, account management, or servicing or data verification services, regulatory authorities | No | Not applicable | No | Generally 1 years but also subject to data retention schedules |
| Characteristics of protected classifications under California or federal law | Yes | Directly from you or from service providers | Provide Services to you | Yes | Provide Services to you and regulatory reporting requirements | Entities that provide us with services to provide Services to you and regulatory authorities | No | Not applicable | No | Generally 1 years but also subject to data retention schedules |
| Commercial information | Yes | You directly, from your use of our Services, or from credit or consumer reporting agencies | Service your account | Yes | Policy administration and claims adjudication | Entities that provide us with services to provide Services to you and regulatory authorities | No | Not applicable | No | Generally 1 years but also subject to data retention schedules |
| Biometric information | Yes | You directly when you call our call centers | Detecting security incidents; fraud detection; authentication; protecting against and prosecuting malicious, deceptive, or illegal activity; verifying or maintaining the quality or safety of a service or device or | Yes | To assist in authentication and to service your account | Service providers that assist in authentication and to service your account | No | Not applicable | No | Generally 1 years but also subject to data retention schedules |

| Types of Personal Information | Do we collect it? | Categories of Sources | Purposes of Collection | Do we disclose it to third parties? | Purposes of Disclosure | Categories of Third Parties PI Disclosed To | Do we sell it to third parties? | Purposes of Selling | Do we Share for Behavioral Advertising? | Retention |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | improving a service or device | | | | | | | |
| Internet or other electronic network activity information | No | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable |
| Geolocation datal | No | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable |
| Audio, electronic, visual, thermal, olfactory, or similar information | Yes | When you call our customer service call center | Improve our Services, quality assurance, analytics, or for security purposes | Yes | Improve customer service, loss prevention, authentication or fraud investigations | Entities that provide us with services to improve customer service; entities that provide us with loss prevention services; entities that provide authentication or fraud services | No | Not applicable | No | Generally 1 years but also subject to data retention schedules |
| Professional or employment-related information | No | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable |
| Education information | No | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable |
| Inferences | No | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable | Not applicable |
| Sensitive personal information | Yes | You, your use of our Services, affiliates, subsidiaries, agents or other producers, or financial or other service providers | Maintain or service accounts, provide customer service, process and provide Services, verify customer information, regulatory purposes, or other similar services | Yes | Customer service, account management, financial services, quality and safety services, storage, and regulatory reporting | Entities that provide or assist us with customer service, account management, financial services, storage, and regulatory authorities | No | Not applicable | No | Generally 1 years but also subject to data retention schedules |

For all categories of personal information, we may collect data directly from you, from third parties, including those to whom you have previously provided data, and from our service providers.

We collect and use personal information for business or commercial purposes. For all categories of personal information, these purposes may include auditing; detecting security incidents; protecting against and prosecuting illegal activity (such as fraud); ensuring the physical safety of individuals; debugging, short-term transient use of personal information; performing services on behalf of Spinnaker, such as maintaining or servicing accounts, providing customer service, processing or fulfilling orders and transactions, verifying customer information, processing payments, providing storage, or providing similar services on behalf of Spinnaker; undertaking internal technological research; verifying or maintaining the quality or safety of a service or device; improving a service or device; and monitoring and improving our Services' functionality. We combine the data that we collect in order to provide these functions.

We also collect and use personal information to comply with our legal obligations, resolve disputes, enforce our agreements, and for everyday servicing purposes.

For all categories of personal information, we may disclose your personal information to third parties in the event Spinnaker is involved in a merger, acquisition, or sale or transfer of all or part of its assets. We may also disclose all categories of personal information with our affiliates and subsidiaries. Spinnaker may be required to disclose your personal information to law enforcement, regulatory agencies, or litigants based on enforceable requests for this information. We may also need to disclose information based on fraud protection, credit risk reduction, or other legal purposes.

Please note that for all categories of personal information, we may also disclose your personal information to our service providers, partners, or collaborators we work with in the course of our business, agents or other insurance producers, any entity you instruct us to disclose your personal information to, and others.

Spinnaker retains personal information in accordance with our legal obligations, to defend against claims, or in compliance with our data retention policies and procedures. Also, we may retain your personal information in our backup or archived systems until the retention period of those systems expires.

**16. You may have additional rights under various state privacy laws.**

You may have the following rights with respect to your personal information:

- The right to a notice about our collection, use, disclosure, sale, or sharing of personal information about you. This statement is intended to satisfy this right.

- The right to request access to the personal information, including the specific pieces of personal information that Spinnaker has about you and personal information about any automated-decision making concerning you made by Spinnaker.

- The right to request that Spinnaker correct or amend your personal information.

- The right to request that we delete the personal information we have about you. We may not be required to delete personal information under particular circumstances.

- The right to opt out of the sale your personal information. You may have the right to opt out of cross-context behavioral advertisements.

- The right to ask us to limit our use of your sensitive personal information.

- The right to obtain a copy of your personal information in an easily understandable and portable format that you may also request be transmitted to another entity.

- The right to appeal Spinnaker's denial of your request to exercise a right herein.

- The right to opt out with respect to Spinnaker's use of automated decision-making technology, including profiling.

- The right to be free from retaliation for exercising these rights. We may, however, offer you incentives in return for your data. When you exercise your rights, you may lose access to these incentives, which can include discounts, coupons, or additional services.

- The right to use an authorized agent to submit a request on your behalf.

- The right to request a statement be placed in your file for others accessing your file if you disagree with Spinnaker's refusal to correct, amend, or delete your personal information with a concise statement of what you think is correct, relevant, or fair information and the reasons you disagree with Spinnaker's refusal to correct, amend, or deleted recorded personal information.

You may call us at 1-888-221-7742 or visit our portal to exercise your rights.

Your authorized agent may call us at 1-888-221-7742 to make a request on your behalf. You will be asked to confirm your identity with at least two identification factors, such as a verified email and phone number. If we cannot verify your identity, we will let you know and may deny the request. We must also receive a properly executed authorization form that adequately describes you, your designated agent, and the purpose of the designation. We may deny a request from an agent that does not submit proof that they have been authorized by you to act on your behalf. We may also require that you directly confirm with us that you provided the authorized agent permission to submit the request. The authorized agent must be a natural person or a business entity that is registered with the appropriate state regulatory agency to conduct business in the state they operate and must comply with the requirements of applicable laws.

**17. Victims of domestic violence may have confidentiality rights.**

New York State Insurance Law § 2612 prohibits insurers from discriminating against victims of domestic violence. This law also provides that if any person covered by an insurance policy delivers to the insurer a valid order of protection against the policyholder or other person covered by the policy, then the insurer is prohibited for the duration of the order from disclosing to the policyholder or other person the address and telephone number of the insured, or of any person or entity providing covered services to the insured. If a child is a covered person, then the right established by this section may be asserted by the child's parent or guardian.

**Making a request:**

To initiate a confidentiality request as it pertains to an order of protection, please submit a valid order of protection to the below listed address. You may use this confidential communication request form, if you'd like:

> Spinnaker Insurance Company
>
> 1 Pluckemin Way, Suite 102
>
> Bedminster, NJ 07921
>
> Toll Free Line: 1-(888) 221-7742

If the protected individual is a child, the parent or guardian may make the above request.

**Revoking a request:**

To revoke a confidentiality request, please contact our customer service at 1-(888) 221-7742.

**18. We are based in the United States.**

If you are visiting our Services from outside the United States, please be aware that we are based in the United States and the information we collect will be transferred to, processed, and stored on our servers in the United States in accordance with this privacy policy and applicable laws. The data protection laws and regulations applicable to your information transferred to the United States may be different from the laws in your country of residence.

**19. We may change this privacy policy.**

We may change this privacy policy from time to time. If we make material changes to this privacy policy, we will post the changes on our Services (or our Services that replace them) and provide you notice prior to the changes becoming effective either through the relevant Services or by some other means, such as email or through your account. Your continued use of our Services after such notice constitutes your consent to the changes. We encourage you to periodically review our privacy policy for the latest information on our privacy practices.

**20. Spinnaker provides you with a Consumer Privacy Notice.**

If you are a Spinnaker customer, then Spinnaker provides you with the Spinnaker Consumer Privacy Notice below.

**21.  Spinnaker provides you with a California Financial Information Privacy Act Notice.**

If you are a Spinnaker customer in California, then Spinnaker provides you with the Spinnaker California Financial Information Privacy Act Notice below.

**22.  You may contact us.**

If you have any questions about this privacy policy or our other information practices, please contact us at contact@Spinnaker.com; 1-888-221-7742; or Spinnaker Insurance Company, 1 Pluckemin Way, Suite 102, Bedminster, NJ 07921.

| **FACTS** | WHAT SPINNAKER DOES WITH YOUR PERSONAL INFORMATION? |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us.  This information can include:<br><br>• Name and date of birth<br>• Property information and property records<br>• Checking account information and credit-based insurance scores |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Spinnaker chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Spinnaker share? | Can you limit this sharing? |
|---|:---:|:---:|
| **For our everyday business purposes —** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes —** to offer our products and services to you | No | No |
| **For joint marketing with other financial companies** | No | No |
| **For our affiliates' everyday business purposes —** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes —** information about your creditworthiness | No | We don't share |
| **For our affiliates to market to you** | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |

| **Questions?** | Call toll-free 1-800-747-3214. |
|---|---|

| Who we are | |
|---|---|
| **Who is providing this notice?** | Spinnaker Insurance Company and its insurance company subsidiaries |

| What we do | |
|---|---|
| **How does Spinnaker protect my personal information?** | To protect your personal information from unauthorized access and use, we maintain physical, electronic, and procedural safeguards that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does Spinnaker collect my personal information?** | We collect your personal information, for example, when you:<br>•    apply for insurance or pay insurance premiums<br>•    provide account information or give us your contact information<br>•    file an insurance claim<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>•    sharing for affiliates' everyday business purposes – information about your creditworthiness<br>•    affiliates from using your information to market to you<br>•    sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |

| **What happens when I limit sharing for an account I hold jointly with someone else?** | Your choices will apply to everyone on your account. |
|---|---|

## Definitions

| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• Our affiliates include financial companies such as companies that share the Spinnaker, Mainsail, Masthead, or Hippo brand. |
|---|---|
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• Spinnaker does not share with nonaffiliates so they can market to you. |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• Spinnaker doesn't jointly market. |

## Other Important Information

We will also comply with more restrictive state laws to the extent they apply.

**California Residents**: We will not share your information with nonaffiliated third parties for their marketing purposes except with your express consent. California residents will also be provided an "Important Privacy Choices" notice explaining their rights under the California Financial Information Privacy Act.

**Nevada Residents**: Nevada law allows us to make marketing calls to our existing customers listed on the National Do Not Call Registry. This notice is provided to you pursuant to state law. If you prefer not to receive marketing calls from us, you may be placed on our internal Do Not Call List by calling 1-888-221-7742. If you would like more information about our practices, you may call 1-888-221-7742. You may also contact the Nevada Attorney General's office: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: aginfo@ag.nv.gov.

**Vermont Residents**: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**AZ, CA, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, or VA Residents.** The term "Information" means information we collect in connection with insurance transactions. You have the right to request access to, correction, amendment, and deletion of personal information that we have about you. Please contact us at compliance@spinnakerins.com or Spinnaker Insurance Company, 1 Pluckemin Way, Suite 102, Bedminster, NJ  07921 with a notarized letter and include your name, address, and your policy, contract, or account number, and describe the information you wish to access, delete, or correct. We may share your Information with nonaffiliates without your prior authorization as permitted or required by law, such as for purpose of conducting actuarial or research studies that comply with applicable law. We may share your Information with insurance regulatory authorities, law enforcement, consumer reporting agencies, auditors, and as permitted or required by law. Information we obtain from a report prepared by an insurance-support organization may be retained by that insurance-support organization and disclosed to others.